## In re AUGUSTA POTTERY CO.

(District Court, N. D. West Virginia. September 15, 1908.)

BANKRUPTCY—RIGHT TO DIVIDEND—COLLATERAL CONTROVERSY BETWEEN CREDITORS.

The trustee in bankruptcy of a manufacturing corporation sold its plant to an agent, acting for a bank of which he was cashier and certain other banks, all of which were creditors. The sale was reported as for cash, and was so confirmed; but in fact the trustee accepted pass books from the banks containing credits for their respective shares of the purchase money. The cashier of one of such banks acted in the matter without authority, and it afterward removed him and repudiated the transaction. A dividend having been ordered, the trustee refused to pay such bank, because of its refusal to accept a certain check drawn on it-

self. *Held*, that such controversy was one wholly between the purchaser, who had not in fact paid all the purchase money, and such bank, which it was not within the jurisdiction or province of the court of bankruptcy to determine, but that the bank as a creditor was entitled to an order requiring the trustee to pay its dividend.

In Bankruptcy. On petition of the Exchange Bank of Mannington.

Showalter & White, for petitioner.
C. A. Snodgrass, for respondent Furbee.
C. A. Snodgrass, W. S. Meredith, and L. S. Schwenck, for respondent First Nat. Bank of Mannington.

DAYTON, District Judge. The administration of this bankrupt corporation's estate has been difficult and protracted. It has been twice before the Circuit Court of Appeals. See Morgan v. First Nat. Bank, 145 Fed. 466, 76 C. C. A. 236; Morgan v. Benedum, 157 Fed. 232, 84 C. C. A. 675. The questions now to be determined grow out of the following facts:

Morgan, the trustee, sold the pottery plant under order of the referee for $38,000 to Furbee, acting as agent for the First National Bank of Mannington, the Bank of Mannington, the Home Gas Company, and, it is claimed, the Exchange Bank of Mannington; but the latter denies that it was party to, or in any way concurred in, the purchase. This sale was made on September 22, 1904. By the terms of the order it was to be sold for one-fourth cash and the residue upon 6, 12, and 18 months' credit. Morgan reported this sale as having been made to Furbee for cash, the purchaser electing so to pay, and it was duly confirmed, and Morgan, trustee, by deed conveyed the property to Furbee, the purchaser. My predecessor and the referee overlooked at the time the requirement of the bankrupt act, and did not direct the trustee to deposit the fund arising from the sale in an authorized bank. The three banks, the gas company, and Furbee were all holders of the bonds of the bankrupt, and a controversy arose as to the lien claimed for these bonds, which was very spirited and occasioned the first appeal to the Circuit Court of Appeals. Finally, on January 22, 1908, an order was entered by the referee directing payment of 43.73 per cent. of the debts in accordance with a dividend sheet then made. Among the creditors so directed to be paid this percentage were the Exchange Bank on its debt of $5,274.17, the First National Bank on its debt of $18,402.50, and Furbee on his debt of $1,539.61. The trustee has complied with this order, and paid all other creditors the required percentage of their debts, except these three; and to enforce collection of such payment to it the Exchange Bank has filed this petition. The trustee, the First National Bank, and Furbee have all answered this petition, and the reasons why the trustee refuses to pay are substantially these:

Furbee was at the time of the purchase of the plant by him, and still is, cashier of the First National Bank. At that time one Jolliffe was cashier of the Exchange Bank, but is no longer so. The three banks at Mannington, the First National, the Exchange, and the Bank of Mannington, it seems, were anxious to secure the deposit with them

of the funds arising from this sale by Morgan, the trustee. Instead, therefore, of paying the purchase money in cash, Furbee secured to be issued to Morgan by.the First National Bank a pass book showing a deposit there in his favor of $4,750, by the Bank of Mannington a like pass book showing a deposit to his credit of $3,562, and by Jolliffe, cashier of the Exchange Bank, a like pass book showing a deposit in that bank to his credit of $1,187.50. These three sums aggregated the cash payment of $9,500 required; and some days after in these pass books were entered additional credits to Morgan of $14,321.25 in that of the First National, of $10,740.93 in that of the Bank of Mannington, and of $3,580.32 in that of the Exchange Bank, which last three sums aggregated the balance of the purchase money. The issuance of this deposit book, it is claimed by the Exchange Bank, was done by Jolliffe, its then cashier, without authority, and it is admitted that at the time no such deposits were in fact made. Some time after this Furbee sold the plant to the Homewood Pottery Company for $38,-142.50, and thereupon paid by his personal check to the First National Bank $19,071.25 to cover the deposit credit given by that bank to Morgan, to the Bank of Mannington by check for a like purpose $14,303.43, and sought to pay to the Exchange Bank by sending to it a check drawn by one Clayton on said Exchange Bank for $3,775 and his personal check for $992.82, the balance necessary to cover the $4,767.82 deposit credit which Jolliffe, its cashier, had extended by the pass book to Morgan. The Exchange Bank refused to accept this settlement, and several times returned the checks. They were sent back and forth, until the teller of the First National Bank, by direction of Furbee, took them over and left them at the Exchange Bank.

The trouble all turns around the Clayton check for $3,775. This check was executed under these circumstances: Schwenck, trustee for the Southern Tanning Company, bankrupt, sold the plant of that company to Clayton. Jolliffe, the Exchange Bank's then cashier, was personally interested with Clayton in this purchase, and had agreed to furnish at least a part of the purchase money. Clayton, without in fact having funds there, drew this check on the Exchange Bank and tendered it to Schwenck in payment or part payment of the purchase price of the tanning plant. Schwenck refused to accept the check unless the First National Bank, wherein he had been directed by this court to deposit the fund, would take it as cash and give him a deposit credit as trustee. Thereupon Furbee, the First National Bank's cashier, Schwenck, and Clayton went to the Exchange Bank, saw Jolliffe, who told Furbee to take the check and send it in to the Exchange Bank in the regular course of next day's business and it would be paid. It was so sent in, and, as I have said, returned several times and refused. Jolliffe some time after was removed as cashier of the Exchange Bank, and Showalter became his successor. In October, 1906, this court directed Morgan, trustee, to deposit all funds due to the cause in the First National Bank of Grafton, and all sums have been adjusted and paid to the trustee, except the $3,775.

It is clear, it seems to me, that the real controversy here is between the First National Bank and the Exchange Bank, as to whether the latter, under the circumstances, is liable to the former for the $3,775

Clayton check; and it seems very clear, also, that in the settlement of this question this court of bankruptcy, with its limited jurisdiction, can have nothing to do. It is beyond question that Furbee, in purchasing the pottery plant, was acting as agent for the First National Bank, the Bank of Mannington, and the Home Gas Company. The proof wholly fails to show that the Exchange Bank had any interest or concern in the purchase, or that Furbee was authorized by it to act as its agent in the matter. It is clear that Furbee did not comply with the terms of the sale and pay cash, and that Morgan, the trustee, had no right, as such, to receive anything else than cash from Furbee, the purchaser. When he did so it was upon his own personal responsibility. Jolliffe, cashier, had no more legal right and authority to give Morgan credit for a deposit in the Exchange Bank, which was in fact not made, than he would have had to walk off with a like amount of his bank's money; and Furbee, who secured him to do so, cannot for a moment set up, as against Morgan's claim upon him for a balance of unpaid purchase money, such illegal conduct on the part of Jolliffe in which he (Furbee) participated. Nor can this bank, for whom in its answer it admits Furbee was acting as agent in the purchase, by reason of this illegal conduct of Jolliffe, so participated in by its agent, make Morgan and this court the means of collecting its disputed debt against the Exchange Bank.

Morgan, it is true, by reason of his having accepted Furbee's pass books as money and reporting the sale as a cash one, is estopped from now denying payment to him so far as creditors are concerned, and this court can only go to the extent of enforcing the decree heretofore entered, requiring him to pay to the Exchange Bank 43.73 per cent. of its debt; but no reason is apparent why he should not so pay with funds in his hands due to either Furbee, the agent, or the First National Bank, the admitted principal, who have not in fact paid to him the purchase price by $3,775. And this can in no way interfere with or impede the right of the First National Bank to sue, in a court having jurisdiction, which this one has not, the Exchange Bank upon its demand growing out of the Clayton check, if it desires to do so.